**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABBVIE INC. and ABBVIE BIOTECHNOLOGY LTD, | ) | |
| | ) | |
| | ) | Case No. 1:21-cv-2258 |
| Plaintiffs, | ) | Case No. 1:21-cv-2899 |
| | ) | |
| v. | ) | Hon. Judge John Z. Lee |
| | ) | |
| ALVOTECH HF., | ) | Magistrate Judge M. David Weisman |
| | ) | |
| Defendant. | ) | |

---

**<u>DECLARATION OF DR. CHARLES REINHOLTZ, PH.D. IN SUPPORT OF
DEFENDANT ALVOTECH HF.'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

I, Dr. Charles Reinholtz, declare as follows under penalty of perjury under the laws of the United States:

**I.     INTRODUCTION**

1.     I have been retained by Alvotech hf. ("Alvotech") in the patent infringement lawsuit referenced above as a technical expert on autoinjectors.

2.     I understand that the parties in this case will be asking the Court to construe certain terms contained in the claims of United States Patent No. 6,805,686, which was filed on May 6, 2003. In this Declaration, I will refer to the patent by its last three digits, *i.e.*, the '686 patent.

3.     I have been asked by Alvotech to provide an explanation, for the benefit of the Court, of how a person having ordinary skill in the art in the 2003 timeframe would have understood certain aspects of the technical disclosures of the '686 patent that relate to disputed claim terms. I have also been asked to explain how certain terms of art used in the '686 patent

1

would be understood by a person having ordinary skill in the art in the 2003 timeframe. This Declaration contains those explanations.

4. I am prepared to testify before the Court about the explanations contained in this Declaration, if called upon to do so.

## II. EDUCATION, PROFESSIONAL EXPERIENCE, AND QUALIFICATIONS

5. Below, I highlight certain achievements from my education and professional experience. My education and experience are described more fully in the attached curriculum vitae (**Exhibit A**).

6. I have over forty years of experience in mechanical engineering. I earned a Bachelor of Science degree in 1976, a Master's degree in 1980, and a Ph.D. in 1983, all in mechanical engineering from the University of Florida. My graduate research focused on the design and analysis of mechanisms for the creation and conversion of motion and forces. My Ph.D. dissertation, entitled "Optimization of Spatial Mechanisms," presented a new approach for synthesizing mechanisms to produce complex three-dimensional motion while meeting specific practical constraints. This dissertation represented one of the earliest efforts to use computer-programmed numerical optimization tools for the design of three-dimensional mechanisms.

7. I am a Professor of Mechanical Engineering at Embry-Riddle Aeronautical University in Daytona Beach, Florida. I have held this position since 2007. From 2007 to 2017, I also served as Chair of the Mechanical Engineering Department. In that capacity, I guided the nascent department from a bachelor's degree program with an initial enrollment of 29 students to a Ph.D.-granting department with a total enrollment of over 400 students. The growth of the program included the creation of a specialized degree track within Mechanical Engineering focused on Biomedical Engineering.

8.     As part of my university employment, I have worked on a number of externally-sponsored research and development projects dealing directly with medical devices and technologies.  For example, I worked on the design of a cyclic sliding, dynamically loaded wear testing device for the evaluation of total knee replacement materials.  This was part of a broader study investigating the effects of friction, wear and lubrication on cartilage and various candidate materials for knee-replacement joints. My experience also includes the investigation and implementation of processes, techniques and machinery for the safe processing and disposal of medical waste.  I worked on a variety of projects with Nautilus dealing with biomechanics, exercise physiology and instrumented machines for joint injury rehabilitation and physical therapy.  My experience also includes research from 2005 through 2007 to develop a practical implementation of a patented, self-propelled colonoscope.

9.     I previously held positions at Virginia Tech as an assistant professor (1983-1988), associate professor (1988-1993), professor (August 1993-2007), W.S. White Chair for Innovation in Engineering Education (Aug. 1996 to Aug. 1999), Assistant Department Head and ABET Review Chair (1996-2002), and Alumni Distinguished Professor (2002-2007).

10.     I am a Fellow in the American Society of Mechanical Engineers (ASME) and have held numerous other positions within that organization, including Associate Technical Editor, ASME Journal of Mechanical Design, and Paper Review Chairman and Proceeding Editor for the ASME Mechanisms Conference.  I am also a member of the Society of Automotive Engineers (SAE), Tau Beta Pi, Pi Tau Sigma, Sigma Xi, Epsilon Lambda Chi, and the Association for Unmanned Vehicle Systems International (AUVSI).  I am also a former member of the American Nuclear Society and the American Society for Engineering Education (ASEE).

11.     I have received numerous honors and awards throughout my career in mechanical engineering, including receiving the National Science Foundation Presidential Young Investigator Award, the Applied Mechanisms Conference Procter and Gamble Best Paper Award on two separate occasions and being awarded the National Applied Mechanism Conference South-Pointing Chariot Award for lifetime contributions to the mechanisms community.  Numerous other awards and recognitions are summarized in my CV.  I have worked on over 65 funded research projects that have received grants totaling more than $15 million.

12.     My teaching and research have generally been focused on the design and analysis of mechanisms and mechanical systems. My teaching has included courses on mechanisms and kinematics, mechanical design, controls, electro-mechanical systems, robotics, and project-based capstone design.  Among the topics I routinely teach are the design and analysis of gears, gear trains, screws, clutches, escapements, and rotary-to-linear and linear-to-rotary motion mechanisms.

13.     I have authored over 125 journal and conference papers in the areas of mechanisms, kinematics, robotics, and mechanical design.  I also have co-founded three companies in the area of robotics and unmanned vehicle systems.  I am the co-author of *Mechanisms and Dynamics of Machinery*, a popular textbook published in 1987 by John Wiley.  This textbook is focused on the design and analysis of mechanical devices and systems for the creation and transmission of forces and motion.  Machine elements for converting and controlling motion and forces are important topics of the text.  Devices such as cams, linkages, gears, gear trains, screws, and intermittent-motion devices are discussed and analyzed in detail in the text.

14.     I am a named inventor on two patents: U.S. Patent 5,699,695 entitled "Spatial, Parallel-Architecture, Robotic Carpal Wrist," which issued on December 23, 1997; and U.S. Patent

4,998,942, entitled "Snubber Profile," which issued on March 12, 1991. I was also an editor of four books, and I have been invited and provided presentations at numerous national meetings, including "Trends and Opportunities in Mechanisms Research," Plenary Session Speaker at the 4th National Applied Mechanisms and Robotics Conference, Cincinnati, Ohio, 1995; "Product Safety and Product Liability," Invited Lecture at the 2001 ASME World Congress, New York, NY, 2001; "Challenges and Opportunities Offered by the DARPA Grand Challenge," Invited Presentation at the 2004 AIAA Unmanned Aerial Vehicle Conference, Chicago, IL, September, 2004; and "Test Drive an Autonomous Vehicle" invited presentation to the United Services Automobile Association (USAA), San Antonio, TX, 2009. A complete list of my publications and patents are included in my curriculum vitae (Exhibit A).

15.     As part of my expert witness consulting experience, I have worked on two cases involving pen-type devices used to inject medicine and the drive systems and mechanical components employed by these pen-type injectors. The pen-type injectors in those cases were typically customer-operated for self-administration of medication. As a result, they were necessarily robust, easy-to-use, and, in many cases, disposable. I have also worked on cases involving cervical traction devices and inversion machines that work by stretching the spinal vertebrae and muscles to relieve pressure and pain. In addition, I have worked as a non-testifying expert on NDA-protected matters involving pen injector shroud mechanisms and medical sterilization equipment. A list of my deposition and court testimony as an expert witness over the past four years is provided in **Exhibit B**.

### III.     MATERIALS CONSIDERED AND COMPENSATION

16.     As part of my work in this matter and in connection with this Declaration, I have considered the materials listed in **Exhibit C**. Based on my education and experience, and the

materials listed in Exhibit C, I have formed certain opinions and made certain observations regarding how "a person of ordinary skill in the art," as I understand that term, would have understood certain terms in the claims of the '686 patent. These opinions and observations are explained in greater detail in the sections to follow. I believe that my opinions and observations may assist the Court in its determination of the claim construction issues raised by the parties.

17.    I am being compensated for my work in this case at my customary hourly consulting rate of $450 per hour plus reasonable expenses. My compensation is in no way based on the outcome of this litigation. Other than my retention as an expert witness in this matter, I have no prior affiliation with Alvotech hf., or with Plaintiffs AbbVie Inc. and AbbVie Biotechnology Ltd. (Plaintiffs"). I have no interest, financial or otherwise, in the outcome of the current patent infringement litigation between these companies.

18.    I reserve the opportunity to update, supplement, or amend this Declaration in view of further analysis or additional information that might be obtained or become available at a later time or to address new or different positions taken by Plaintiffs.

## IV.    LEGAL PRINCIPLES

19.    In expressing opinions on what I understand might be considered to be legal issues, I have applied the following legal standards conveyed to me by Alvotech's counsel. I understand from Alvotech's counsel that terms in patent claims must be read as they would have been understood by a person of ordinary skill in the art at the relevant time period, also referred to herein as a "POSA." I have been advised by Alvotech's counsel that the relevant time period is in the 2003 timeframe. My opinions set forth in this Declaration are the same, and would not change, regardless of exactly where the relevant date falls within the 2003 timeframe.

20.     I have been advised that the words of a claim are generally given their ordinary and customary meaning. Where claim construction involves technical terms in a scientific field, determining the ordinary and customary meaning of the disputed term requires examination of terms that have a particular meaning in a field of art.  In such instances, I understand that the Court looks to those sources available to the public that show what a POSA would have understood disputed claim language to mean, including the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

21.     I understand that claims must be read in view of the specification, of which they are a part.  I have also been told that a patentee may act as his own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning.  A patentee can define a claim term through an express definition or through implication.  If a patentee defines a term in the specification, the definition is considered the single best guide to the meaning of a disputed term.

22.     I have also been told that the Court will consider the file history (or prosecution history) in construing claim terms.  However, I have been advised that the file history often lacks the clarity of the specification and thus may be less useful for claim construction purposes.

23.     I have been advised that a patent applicant may express an element in a claim in a "means-plus-function" format in which the element is described as a means or step for performing a specified function without reciting the structure of the element to be used.  I understand that when a claim term lacks the word "means," there is a presumption that that term is not a means-plus-function term.  I understand, however, that that presumption is not a strong presumption and can be overcome.  I further understand that the "essential inquiry" is whether the words of the

claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. Where the words of the claim fail to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function, I understand that the presumption is overcome and the corresponding claim term must be construed as a means-plus-function term.

24. I have also been advised that construing a means-plus-function limitation is a two-step process. The first step is to determine the function of the limitation. The second step is to determine what structure(s) in the patent specification, if any, corresponds to the claimed function. Structure disclosed in the specification qualifies as corresponding structure only if the intrinsic evidence clearly links or associates that structure to the claimed function, and the structure is sufficient to achieve the claimed function.

## V. PERSON OF ORDINARY SKILL IN THE ART

25. I understand that claim construction is performed from the perspective of a person having ordinary skill in the art at the time of the invention. I also understand that factors to consider in determining the level of ordinary skill in the art may include the education level of the inventors, the type of problems encountered in the art, prior art solutions to those problems, rapidity with which innovations are made, sophistication of the technology, and education level of active workers in the field. I also understand that not every factor may be present and that one or more factors may predominate.

26. In my opinion, a hypothetical POSA for the subject matter claimed in the '686 patent would typically have had a degree in mechanical engineering or a closely related field, and at least two years of experience working with drug delivery devices. The person could also be someone with education in other fields related to device design, but with greater practical

8

experience. I consider myself to be—and to have been at least as of the invention date of the '686 patent—of at least ordinary skill in the art.

## VI. TECHNOLOGY BACKGROUND AND THE '686 PATENT

### A. Autoinjectors

27.     An autoinjector is a medical device that a patient can use to self-inject a dose of medication. Autoinjectors are useful for patients who need to receive medication without the assistance of a medical professional. Unlike a traditional needle syringe, the patient need not manually insert the needle of an autoinjector into their skin. Rather, most autoinjectors automatically insert a needle, sometimes without allowing the needle to be visible to the patient. Therefore, autoinjectors simplify injection and allow patients to overcome the fear of needles often associated with self-administration using a manual syringe. Autoinjectors can be a convenient and inexpensive way for patients to receive medication multiple times a day or when an unexpected need arises.

### B. The '686 Patent

28.     The '686 patent is entitled "Autoinjector with Extendable Needle Protector Shroud." The Abstract of the Invention describes the patent as being directed to "a syringe and a method for using the same," in which the syringe contains, among other things, "an actuator to deploy the plunger spring," an "interlocking assembly," and a shroud "moveable between a retracted position and an extended position, the shroud surrounding at least a portion of the needle when in the extended position." (JA000014 ('686 patent) at Abstract.)

29.     The '686 patent has 24 claims. I understand that three of those claims are "independent." I understand that the others are "dependent," which means that they include all of the limitations of the claim or claims from which they depend. Although I have not been asked to

provide an opinion regarding possible infringement, I understand that Plaintiffs are asserting claims 1, 3, 4, 11, and 12 of the '686 patent. Below, I have reproduced claim 1, the only asserted independent claim. Within the claim, I have added emphasis using boldface italic font on the claim terms that I understand the parties dispute:

> 1. A syringe comprising:
>
> > a housing having a proximal end and a distal end, the housing having a reservoir disposed therein;
> >
> > a plunger to be received by the reservoir, the plunger being moveable between a first plunger position and a second plunger position;
> >
> > a plunger spring configured to urge the plunger toward the second plunger position when the plunger spring is deployed;
> >
> > ***an actuator to deploy the plunger spring;***
> >
> > a needle proximate the distal end of the housing, the needle in fluid communication with the reservoir;
> >
> > a shroud coupled with the housing, the shroud being moveable between a retracted position and an extended position, the shroud surrounding at least a portion of the needle when in the extended position;
> >
> > a shroud spring biased to urge the shroud toward the extended position when the shroud spring is deployed; and
> >
> > ***an interlocking assembly in communication with the shroud, the interlocking assembly having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position.***

30. The '686 patent discloses two similar structures for actuators, both of which require a user to exert pressure on an external digit interface surface, such as a button, to use the device. The first embodiment uses an engagement element with a key-hole shaped slot to retain the plunger and then release it when the user exerts pressure on an external digit interface button. Although the specification lacks detailed information regarding the second actuator embodiment, it appears

that this embodiment replaces the key-hole shaped slot with a frangible member to retain the plunger and then release it when the user exerts pressure on an external digit interface button. JA000014 at 8:33-62. The patent states that these actuators can be moved to disengage an engagement element from a mating surface of the plunger, and the plunger spring then causes injection to occur. *Id.* at 13:57-66.

31.     The '686 patent discloses automatic and manual structures of an interlocking assembly in communication with the shroud with a first condition to maintain the shroud in the retracted position, and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position. In the automatic example, the interlocking assembly is disengaged solely by movement of the plunger 400. The interlocking element includes at least one flexible tab 740 that initially "prevent[s] shroud 700 from moving toward its extended position." *Id.* at 10:39-59. When the injector is triggered, the plunger moves distally, causing flexible tab 740 to be biased outwardly by engagement surfaces 456. The bias force causes seating element 915 to be either ruptured (if it is a frangible element) or forced out of engagement with outwardly projecting portion 263 of interior wall portion 260 of housing 200. In either case, this allows movement of the shroud toward the extended position. A cam surface is provided on either the flexible tab 740 or on the engagement surface 456 to create the biasing force. *Id.* at 10:66-11:54.

32.     The manual example of the interlocking assembly is not illustrated in the specification. It operates by having a user press a "digit interface surface" which causes an arm or similar structure that protrudes through an opening in the housing 200 to contact cam surface 917 on tab 740. When actuated by a user, the arm of shroud actuator disengages seating surface 915

11

from outwardly projecting portion 263 and allows shroud 700 to deploy under the force of shroud spring 800.

## VII.  THE TERM "AN ACTUATOR TO DEPLOY THE PLUNGER SPRING" AS USED IN THE '686 PATENT DOES NOT CONNOTE STRUCTURE

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| an actuator to deploy the plunger spring<br><br>(Asserted claim 1 of the '686 patent) | Means-plus-function limitation<br><br>Function: to deploy the plunger spring<br><br>Structure: (i) a mechanical switch having an external digit interface surface, such as a button, or (ii) a frangible member ruptured by exerting digital pressure on an external digit interface surface or (iii) equivalent structures thereof | Plain and ordinary meaning, i.e., "an actuator to facilitate expansion of the plunger spring" |

33.     Claim 1 of the '686 patent claims a "syringe comprising . . . an actuator to deploy the plunger spring . . . ."

34.     Even though claim 1 of the '686 patent does not include the word "means", it is my opinion the "actuator to deploy the plunger spring" limitation should be interpreted as a means-plus-function limitation and subject to 35 U.S.C. § 112(f) because it fails to recite sufficiently definite structure.  As I explain below, the term "actuator" in the limitation "actuator to deploy the plunger spring" does not have a sufficiently definite meaning as the name for a structure.  Instead, the word actuator is a verbal construct that acts as a nonce term to describe a means for performing the function of deploying the plunger spring.

35.     In my opinion, the term "an actuator to deploy the plunger spring," as used in claim 1 of the '686 patent, does not recite a defined structure; instead, a POSA would have understood the term to convey a purely functional meaning, *i.e.*, a means for deploying the claimed plunger spring.

36.     A POSA would not ordinarily understand the term "an actuator to deploy the plunger spring" to convey a particular or specific structure.  The term "actuator" instead appears to be a functional term where the function—to deploy the plunger spring—modifies what is essentially a placeholder (or nonce) term—an actuator.

37.     Claim 1 only uses the word "actuator" once, in the phrase "an actuator to deploy the plunger spring."  These words do not define a structure for "actuator."  Rather, the word "actuator" as used in claim 1 of the '686 patent is a generic description for any element or combination of elements that performs the function of deploying the plunger spring.  It does not indicate any structure because it sets forth the same black box recitation of structure as the word "means."  Therefore, a person of skill in the art would understand the term "actuator" as a replacement for the term "means" in the claim limitation.  In the context of the claims of the '686 patent, the claim language, "a means to deploy the plunger spring" is equivalent to the claim language "an actuator to deploy the plunger spring" because the substitution would not change the meaning or scope of the claim.  That is, the term "actuator" could be replaced by "means" and the meaning of the phrase and the scope of the claim would be exactly the same.

38.     The claim limitations of the '686 patent do not provide or impart any structure to the claimed function, deploying a plunger spring.  No claim language identifies the characteristics of a physical or structural component of the "actuator."  Rather, the claim simply recites "an actuator."  Further, the claim provides no structural context for determining the characteristics of the "actuator" other than to describe its function.  Thus, the unadorned term "an actuator to" is a substitute for the term "a means to."

39.     In the context of the claims of the '686 patent, the term "an actuator to deploy the plunger spring" is so broad that it would encompass any means that functions to deploy the plunger

spring. Many well-known nonce terms, including "mechanism to", "device to", "component to", "element to" and "member to," would convey the same meaning and suffer from the same lack of structure as the term "actuator to" in the context of claim 1 of the '686 patent. I believe it would be impossible for a POSA to find any distinction in meaning or claim scope comparing the limitation using the term "actuator to" with the same limitation using any of the well-known nonce terms substituted below.

- "an actuator to deploy the plunger spring"
- "a mechanism to deploy the plunger spring"
- "an element to deploy the plunger spring"
- "a member to deploy the plunger spring"
- "a device to deploy the plunger spring"
- "a means to deploy the plunger spring"

40. In my experience, the term "actuator" is a generic term appearing in technologies as diverse as cars,[1] trains,[2] ships,[3] airplanes,[4] wheelchairs,[5] satellite dishes,[6] robots,[7] jukeboxes,[8]

---

[1] Electrak® Actuators and Controls, Warner Electric, Inc. (2000), attached to this declaration as **Exhibit D**, at 7.

[2] Dictionary of Mechanical Engineering (Nayler G.H.F. ed. 1999) (7th ed. 2000), attached to this declaration as **Exhibit E**, at 3 (an example of an "actuator" used in "automatic train control is an air-operated differential piston and mechanism mounted on an automatic brake valve to operate at a predetermined brake pipe pressure reduction").

[3] Webster's Third New International Dictionary of the English Language Unabridged (Gove P.B. ed. 2002), attached to this declaration as **Exhibit F**, at 22 (an example of actuator is "a motor that turns the rudder of a large ship"); Exhibit D at 6.

[4] Exhibit F at 22 (an example of actuator is "a motor that…moves the elevators of an airplane or an air brake cylinder operated by a motorman").

[5] Exhibit D at 7.

[6] Newton's Telecom Dictionary (Newton H. ed. 2002), attached to this declaration as **Exhibit G**, at 34 (defining "actuator" as a "[m]otorized device used to position an earth-bound satellite dish for reception of programs").

[7] IEEE 100 The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000), attached to this declaration as **Exhibit H**, at 16 (an example of an "actuator" is "a motor or transducer that uses electrical, hydraulic, or pneumatic energy to affect motion in a robot").

[8] Exhibit H at 16 (an example of an "actuator" is "the device that selects a laser disk in a juke box, or an access arm in a magnetic disk drive").

and even weapons.[9]  A POSA would have known that devices called "actuators" function in many different ways and come in many different physical forms.  An actuator could, for example, be hydraulically, electrically, thermally, pneumatically, or mechanically powered, and operate to produce linear or rotary motion.  A POSA would have understood that there were no common structural features found across these various "actuators," and the only common ground is that they each serve the function of "actuating" something.  Even within the autoinjector field, a person of ordinary skill in the art would have known about a variety of mechanisms used as a part of the injection process.  For example, autoinjectors could be powered by compressed gas or a spring,[10] and could be triggered with or without a user digit interface.[11]

    41.    Recognizing that the only common feature of actuators is their function, dictionaries in the 2003 timeframe defined "actuator" functionally.  For example, the second edition of the Dictionary of Materials and Testing defines "actuator" as "[a] device that actuates."[12]  The 2001 Tabers Cyclopedic Medical dictionary defines "actuator" as "[a] component of a mechanical or electronic device that initiates a given action."[13]  The 2000 American Heritage Dictionary defines "actuator" as "[o]ne that activates, especially a device responsible for actuating

---

[9] McGraw-Hill Dictionary of Scientific and Technical Terms (2d ed. 1978), attached to this declaration as **Exhibit I**, at 32 (one definition of "actuator" is "the receiver mechanism in certain types of automatic weapons")

[10] *Compare* Kelly, J., No needle, but the damage was done: Here's why jet injectors fell from favor, The Washington Post (Feb. 2, 2021), attached to this declaration as **Exhibit J**; Miller, J.B., Needle-Free Injection Device Eliminates Threat of Needlesticks, Med Device Online (2000), attached to this declaration as **Exhibit K**; U.S. 5,527,287, attached to this declaration as **Exhibit L**, *with* WO 03/011378, attached to this declaration as **Exhibit M**.

[11] *Compare* Exhibit K *with* EpiPen Directions (2001 Label), attached to this declaration as **Exhibit N**; ATNAA Directions (2002 Label), attached to this declaration as **Exhibit O**.

[12] Dictionary of Material and Testing (Tomsic J.L. ed., 2nd ed. 2000) at 8, attached to the Fogel Declaration as **Exhibit 7**.

[13] Taber's Cyclopedic Medical Dictionary (19th ed. 2001) at 38, attached to the Fogel Declaration as **Exhibit 8**.

a mechanical device."[14]  The 2001 New Oxford American Dictionary defines "actuator" as the

noun derivative of "actuate," which means "cause (a machine or device) to operate."[15]

42.    Accordingly, a POSA would not have understood the term "an actuator to deploy

the plunger spring," as used in the context of claim 1, to convey any definite structure sufficient to

perform the function of deploying a plunger spring. For the reasons stated above, a person of

ordinary skill in the art would read the term "an actuator to deploy the plunger spring" as "a means

to deploy the plunger spring."

## VIII.    THE TERM "AN INTERLOCKING ASSEMBLY…" AS USED IN THE '686 PATENT DOES NOT CONNOTE STRUCTURE

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| an interlocking assembly in communication with the shroud, … having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position<br><br>(Asserted claim 1 of the '686 patent) | Means-plus-function limitation<br><br>Function: to maintain the shroud in a retracted position and then to deploy the shroud spring and allow movement of the shroud toward the extended position<br><br>Structure: an assembly containing an interlocking element such as a flexible tab or frangible member that engages with the shroud to maintain, prevent and hold the shroud in a retracted position, and a cam that biases a flexible tab or ruptures a frangible member to free the shroud to move toward the extended position, or equivalent structures thereof<br><br>If the limitation is not means plus function, it has its plan meaning. The plain meaning of maintain is "hold" or "prevent." The plain meaning of deploy is "release." | Plain and ordinary meaning, i.e., "an interlocking assembly in communication with the shroud, … having a first condition to support the shroud in the retracted position and a second condition to facilitate expansion of the shroud spring and allow movement of the shroud toward the extended position" |

---

[14] The American Heritage Dictionary of the English Language (4th ed. 2000), attached to the Fogel Declaration as **Exhibit 9**, at 18.
[15] The New Oxford American Dictionary (Jewel E.J. & Abate F. eds. 2001), attached to this declaration as **Exhibit P**, at 16.

43.    Even though claim 1 of the '686 patent does not include the phrase "means for," it is my opinion the "interlocking assembly" limitation should be interpreted as a means-plus-function limitation and subject to 35 U.S.C. § 112(f) because it fails to recite sufficiently definite structure.    As I explain below, the term "interlocking assembly" does not have a sufficiently definite meaning as the name for structure.    Instead, the phrase is verbal construct that acts as a nonce term to describe a means for performing the functions of maintaining the shroud in a retracted position and then deploying the shroud spring to allow movement of the shroud toward the extended position. The term "interlocking assembly" has no reasonably well-understood meaning in the art.

44.    Taking the view of a person of ordinary skill in the art at the time of the invention, it is my opinion that the phrase "an interlocking assembly in communication with the shroud, … having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position" does not have a sufficiently definite meaning as the name for structure.

45.    The term "interlocking assembly" is not used in common parlance and does not bring to mind any specific structure to a person of ordinary skill in the art.    Rather, it is used in the patent as a generic description for any element or combination of elements that performs the function of maintaining the shroud in a retracted position and then deploying the shroud spring and allow movement of the shroud toward the extended position.

46.    The claim limitations of the '686 patent do not provide or impart any structure to the claimed function that is performed.    The claim provides no structural context for determining the characteristics of the "interlocking assembly" other than to describe its function.    Although the claim states that the interlocking assembly is "in communication with the shroud," this phrase

provides no structural context for "interlocking assembly." The disclosed syringes are comprised of components that work together. For example, the specification discloses that when the user presses an external digit interface, the movement of the digit interface moves an engagement element out of a plunger mating surface. This allows the plunger spring to be released and deploy the plunger. The interlocking assembly is coupled with the plunger, and thus the movement of the plunger allows the interlocking assembly to switch positions, which in turn allows the shroud to move into an extended position. Because the movement of the digit interface, engagement element, plunger spring, and plunger all trigger the movement of the shroud, they are all arguably "in communication with the shroud." Thus, the phrase "in communication with the shroud" does not supply structural context to "interlocking assembly" because the phrase could be used to describe many different components of the syringe.

47.    Moreover, the surrounding claim language, "having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position," indicates the function of the "interlocking assembly" without providing sufficient structural context to the term "interlocking assembly."

48.    The term "assembly" is a nonce word like "mechanism" and does not denote any structure to the term. The term "interlocking" does not give sufficiently definite structure to the "assembly" term as there are many different ways for two or more components to "interlock." The patent specification discloses two types of components that can interlock: flexible tabs and frangible members. Other types of components that can interlock can include structures as diverse as lugs, bolts, brackets, sockets, studs, elastic elements, rotary switches, zippers or puzzle pieces. A POSA would not know which of these types of structures is included in the claim term "interlocking assembly."

49. I have reviewed various patents and publications that use the phrase "interlocking assembly" as listed and discussed below. These materials illustrate that the phrase "interlocking assembly" has been used to describe a wide variety of structures with varying functions. For example, "interlocking assembly" has been used generically to describe the following structures in prior art patents:

- Interlocking assembly: Elements for securing floating dock units of quadrangular section, comprising eye lugs, outwardly projecting from the four corners of the floating units. The lugs are superposable one over the others at the junction of four adjacent floating units and secured by a large bolt. (U.S. Pat. No. 4,604,962, attached to this declaration as **Exhibit Q**). *Note that the claims of this patent do not use the term interlocking assembly.*

- Interlocking assembly: Components interconnecting or mechanically locking together computer peripheral enclosures. The assembly includes according to one embodiment of this invention four L-shaped brackets connected to the bottom of a first enclosure or modular unit. Two of them extend with their back portions (parallel) up one side (or end) of the unit and the other two up the opposite side (or end). The feet of the brackets are screwed or otherwise secured to the bottom surfaces of the units. (U.S. Patent 5,992,953, attached to this declaration as **Exhibit R**). *Note that the preamble to claim 1 is, **"An interlocking assembly, comprising:"** and the remainder of the claim goes on to describe the details of what is included in the interlocking assembly.*

- Interlocking assembly: A device which includes a member that is provided with an integral projecting stud, a member having an opening that serves as a socket to receive the stud, and an elastic rubber bushing that has locking engagement with both the stud and the socket member when the three elements are assembled. (U.S. Patent 2,876,485, Titled "Interlocking Assembly," attached to this declaration as **Exhibit S,**). *Note that the preamble to claim 1 is, **"An interlocking assembly, comprising:"** and the remainder of the claim goes on to describe the details of what is included in the interlocking assembly.*

- Interlocking assembly: An assembly of containers, removable closures and a holding apparatus. (U.S. Patent 8,844,758, attached to this declaration as **Exhibit T**). *Note that the preamble to claim 1 is, "An interlocking assembly of containers, closures and a holding apparatus, **the assembly comprising:"** and the remainder of the claim goes on to describe the details of what is included in the interlocking assembly.*

- Interlocking assembly: A lockout device for a rotary switch (WO 2008/000022, attached to this declaration as **Exhibit U**); *Note that the preamble to claim 1 is, "A*

> *rotary switch interlocking assembly mountable to a multi-position rotary switch having a shaft and a switch body, the **interlocking assembly including"** and the remainder of the claim goes on to describe the details of what is included in the interlocking assembly.*

50.     These prior art patents either do not use the term interlocking assembly in the claims or they define "interlocking assembly" to comprise additional structural components that give definite meaning to the term. This demonstrates that the term "interlocking assembly," by itself, does not bring a definite structure to the mind of a person skilled in the art.

51.     Interlocking assembly is also used to describe a class of "lockout" devices used for preventing a machine from operating while a door is open and/or when a person might be in danger of being injured. See, for example:

- Dishwasher Door Interlocking Assembly: https://www.buyspares.com/door-interlocking-assembly/product.pl?pid=3258343

- Series 400 Multi Station Interlocking Assembly, https://www.electromechcomp.com/products/multi-station-switch-assemblies/series-400-multi-station-interlocking-assembly/

- Mechanical Key-Type Interlocking Assembly: https://studylib.net/doc/18066498/mechanical-key-type-interlocking-assembly

52.     I also reviewed numerous dictionaries for a definition of the phrase "interlocking assembly" and could not find a definition. These dictionaries include:

1. Dictionary of Material and Testing (Fogel Exhibit 7)

2. Taber's Cyclopedic Medical Dictionary (Fogel Exhibit 8)

3. The American Heritage Dictionary of the English Language (Fogel Exhibit 9)

4. Dictionary of Mechanical Engineering (Exhibit E)

5. Webster's Third New International Dictionary of the English Language Unabridged (Exhibit F)

6. Newton's Telecom Dictionary (Exhibit G)

7. IEEE 100 - The Authoritative Dictionary of IEEE Standards Terms (Exhibit H)

8. McGraw-Hill Dictionary of Scientific and Technical Terms (Exhibit I)

9. The New Oxford American Dictionary (Exhibit P)

10. Modern Dictionary of Electronics, attached to this declaration as **Exhibit V**

11. Power Industry Dictionary, attached to this declaration as **Exhibit W**

12. Merriam-Webster ([www.merriam-webster.com](www.merriam-webster.com)), attached to this declaration as **Exhibit X**

13. Dictionary.com ([www.dictionary.com](www.dictionary.com)), attached to this declaration as **Exhibit Y**

14. Cambridge Dictionary ([www.dictionary.cambridge.org/us](www.dictionary.cambridge.org/us)), attached to this declaration as **Exhibit Z**

I accessed and printed the exhibits from the online dictionaries (*i.e.*, numbers 12-14 above) on November 15, 2021. I am not aware of any dictionary or other general reference that define "interlocking assembly." This is not surprising since "interlocking assembly" is not a phrase used in common parlance by those of ordinary in the art to designate structure.

53. Accordingly, a POSA would not have understood the term "an interlocking assembly in communication with the shroud, … having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position," as used in the context of claim 1, to convey any definite structure sufficient for providing a syringe the means to deploy a plunger spring.

Date: November 19, 2021

_____

Charles Reinholtz

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2021 I caused a true and correct copy of the foregoing to be electronically served on counsel of record via the Court's CM/ECF system.

/s/ *Louis E. Fogel*
Louis E. Fogel